IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 22, 2015


**EWING GREEN, IV v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2011B1815     Steve R. Dozier, Judge**

_____

**No. M2014-01239-CCA-R3-PC – Filed July 13, 2015**

_____

The petitioner, Ewing Green, IV, appeals the denial of his petition for post-conviction relief. He pled guilty to second degree murder, a Class A felony, especially aggravated robbery, a Class A felony, and tampering with evidence, a Class C felony. Pursuant to the agreement, he was sentenced to an effective forty-year sentence in the Tennessee Department of Correction. On appeal, the petitioner contends that his plea was not entered knowingly and voluntarily because he was denied his right to the effective assistance of counsel. Specifically, he contends that trial counsel was ineffective in failing to review discovery with him and by misleading the petitioner with regard to the consecutive nature of the sentences. Following review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J. delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

William E. Griffith, Nashville, Tennessee, for the Appellant, Ewing Green, IV.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachael Sobrero, Assistant District Attorney General, for the Appellee, State of Tennessee.


**OPINION**

## Factual Background and Procedural History

The facts underlying the petitioner's convictions, as recited by the State at the guilty plea hearing, are as follows:

Had this case gone to trial the State's proof would have shown that on March 28th, 2011, the police respond[ed] to[] a shooting at 225 Lowell Street. . . . [A]t that location neighbors had heard multiple gunshots. Most neighbors reported hearing three gunshots and several neighbors in the area from 217 and 225 Lowell Street came out and discovered a Mr. Jose Martin Moya Torres out in the street. He was alive at that time. He was telling witnesses that he had been car jacked by two male blacks and that they shot him. He said that they took his money and his car.

Police responded within minutes and at that time, Mr. Moya told police he had been driving a car owned by Balanka Torres, which was a 2000 Toyota Solera with a Tennessee tag 092 WRB. At that time, Mr. Moya was transported to the hospital and underwent surgery during which he died. And at that time, the police who were still at the scene at 225 Lowell Street processing the scene were in the process of collecting evidence and began a homicide investigation.

On the morning of March 29, 2011, the victim's car was located on Edenwald behind the Miller Mont Technical College. It was abandoned near a concrete barrier on a dead-end road and it had been burned [using] some accelerant substance in an attempt to destroy it.

At that time, crime scene investigators processed that car and were able to lift fingerprints off of the vehicle. One of those fingerprints was identified as belonging to [the petitioner]. Investigators spoke with Jose Rodriguez who owns Rodriguez Service Center on Gallatin Pike. Mr. Moya, the victim, was employed at that location and people at the business told police that earlier the day of the 28th they observed Mr. Moya speaking with two females in a blue Buick. The females were described as a black female and a white female. And that after their [conversations] with [the petitioner], they had called him repeatedly throughout the day asking him to come to their house to fix a fog light.

2

At that time, police also discovered there was an additional witness who operated a mobile car wash in the parking lot of Rodriguez [S]ervice Center, his name is Orlan Deolum (phonetic) and he and his employee Gary Wilks gave police the description of the vehicle and the women as well. And Mr. Wilks knew that the white female's name is Tara Adcock. Based on that information, police looked up Tara Adcock, discovered NES records showing service in her name at 274 Beckleiah.

At that point they went to that location and spoke with . . . Tara Adcock and Lashanda Williamson who both resided at that residence. They both agree[d] to go to north precinct to be interviewed. Also at that time police recovered from 274 Beckleiah five .9 millimeter shell casing[s]. This was important because the three shell casing[s] at the scene of the homicide were all .9 millimeter shell casings.

During interviews of Tara Adcock and Lashanda Williamson, Ms. Adcock admitted to detectives that she had been driving a Nissan Maxima, this was consistent with witness descriptions of one of the vehicle[]s leaving the scene. The other vehicle observed leaving the scene was the victim's Toyota Solera.

She confirmed with police that a man name[d] Jose fixed her tire at Rodriguez Service Center on the 28th and that he was supposed to come to her house to fix a light on the Maxima that night. She later admitted that she was expecting him or had set up a deal for sex and not to fix the fog light on the car.

At that time Ms. Adcock and Ms. Williamson were released and went home the investigation continued and lead police back to 274 Beckleiah where they again searched the home and interviewed witnesses including Lashanda Williamson and Tara Adcock. On the subsequent interview of Ms. Adcock, she explained that she, Lashanda Williamson, Ryan Burford and [the petitioner] left her house to go meet the victim with the intent to rob him. She said that Ryan Burford had a gun and [the petitioner] had a gun and that the two men held the victim at gun point and got his wallet and his car from him. And that as the victim was running away, he was shot.

She told police that [the petitioner] drove the victim's car away and that all four of them participated in trying to burn the car. Lashanda Williamson was interviewed that same day, initially denied being involved

3

in planning a robbery, but later admitted that she did know that it was going to be a robbery and she was involved and that both Ryan Burford and [the petitioner] had guns on them. She admitted to being present while the car was attempted to be burned behind the HH Gregg on Edenwald and that [the petitioner] drove the car to that location to be burned.

[The petitioner] was interviewed by police four separate times. During his first interview after police learned that his print was on the victim's burned car[,] [the petitioner] denied all involvement in any part of a robbery or shooting, but told police that somebody named Cha, who is Jer[e]my Johnson, had called him and asked him to come and burn a car and that he assisted doing that.

During his second interview, he admitted to knowing that there was going to be a lick, meaning a robbery, with quote some Mexican dude. That Tara was supposed to pull a trick with that person. He admitted being present when the victim was shot, but blamed the shooting still on Jeremy Johnson at that point. Police investigated that and learn[ed] that Jeremy Johnson was not at all involved in this incident.

On March 28th, 29th, 2011 Lieutenant Dyer observed the Nissan Maxima that was at issue with this investigation. He attempted to stop the vehicle and the vehicle evaded police and eventually crashed into another vehicle in the Madison area. At that time Ryan Burford was the driver, [the petitioner] was the passenger and a third person named Trammel Wilson was the back seat passenger. Mr. Burford and [the petitioner] fled the scene despite complaints by Lieutenant Dyer to stop.

A .9 millimeter weapon was recovered in the back seat of the Maxima. Later firearms examination revealed that that .9 millimeter was not, in fact, the weapon that shot the shell casings located [over] at Beckleiah or at the homicide scene. However, the firearms investigation did reveal that the shell casings from Beckleiah matched two of the shell casings at the scene of the homicide and the third .9 millimeter casing was also one of the three collected at the crime scene. Indicating that two guns actually were involved in the shooting and two weapons had been fired.

Later the evening of the 29th after running from police, Ryan Burford and [the petitioner] turned themselves in at north pre[cinct]. [The petitioner] finely [sic] admitted he and Ryan Burford were the people involved in this robbery, not Jeremy Johnson. He admitted to having a gun,

4

holding the gun on the victim while the victim was being robbed and admitted that he road [sic] in the Maxima to complete a robbery and that he participated in burning the victim's car afterwards. In a recorded conversation between [the petitioner], Mr. Burford, and Trammel Wilson at the police station later that evening, the three are discussing different aspects of the crime including one portion where [the petitioner] asked Trammel Wilson you got rid of the gun, didn't you. And Trammel Wilson said, yeah, I threw it out the side. [The petitioner] answers to that, well, we are good then.

The petitioner was subsequently indicted for felony murder, especially aggravated robbery, and tampering with evidence. Thereafter, the petitioner accepted a plea agreement under which he pled guilty to second degree murder, especially aggravated robbery, and tampering with evidence. The plea agreement provided for an effective sentence of forty years in the Department of Correction. Specifically, the agreement stipulated a twenty-year sentence for second degree murder, a twenty-year sentence for especially aggravated robbery, and a three-year sentence for tampering with evidence. The two twenty-year sentences were to be served consecutively at 100%, but the three-year sentence was to run concurrently to both sentences.

Prior to accepting the guilty plea, the trial court extensively questioned the petitioner regarding the rights he was waiving by pleading guilty, his understanding of the agreement, and the consequences of pleading guilty. The petitioner acknowledged that he was testifying under oath, denied being under the influence of any medication or drugs, and denied having any mental issues that would affect his understanding of the proceedings. The trial court specifically enumerated the possible sentences that could result if the petitioner was found guilty of the indicted offenses. The petitioner acknowledged that he had reviewed the charges with trial counsel, and he specifically stated that he was satisfied with trial counsel's representation of him except for trial counsel's failure to pursue a bond reduction.

At that point in the hearing, the State enumerated the sentences outlined in the plea agreement. The court then reviewed that information with the petitioner, specifically noting that the two twenty-year sentences would be served consecutively, resulting in an effective sentence of forty years. The petitioner then asked the court why they could not be served concurrently. The trial court responded that, while the sentences could be imposed concurrently, ". . . that is just the plea bargain agreement. The state is dropping the life sentence that they think they can get and you are agreeing to this particular plea bargain agreement if you enter this plea." At that point, trial counsel requested a moment to speak with the petitioner. Following their off-the-record discussion, the trial court

again specifically enumerated the sentences that the plea agreement provided. The petitioner stated that he understood.

The court then reviewed the litany of rights that the petitioner would be waiving by entering the plea agreement, and the petitioner indicated his awareness of those rights. He stated that he understood the agreement, had signed it, and that there was no force or promises that caused him to accept the agreement. The petitioner stated that trial counsel had reviewed the plea agreement with him and had answered the one question the petitioner had regarding the agreement.

The trial court then asked the petitioner if he had any questions, and the petitioner stated that he "was going to see could you get it ran concurrent . . . ." The court again answered the petitioner's question, stating:

> No. If this plea is entered - - I don't get involved in plea negotiations, so the State's offered this sentence to a plea to this lesser charge of second degree murder, [trial counsel] is your attorney, so I don't get involved in that. So if this plea is entered, it will be entered the way we have already discussed it.

The petitioner responded that he had no further questions and that he wanted to enter the plea. Following the recitation of the factual basis, the court accepted the plea, noting that it found that it had been entered by the petitioner knowingly and voluntarily.

The petitioner filed no direct appeal. However, he subsequently filed two pro se petitions for post-conviction relief alleging ineffective assistance of counsel and an unknowing and involuntary guilty plea. He claimed that trial counsel's ineffectiveness resulted in his failure to understand the plea process. An amended petition was filed following the appointment of counsel. The petitions alleged multiple instances of alleged deficient performance. Among others allegations, the petitioner contended that trial counsel failed to review discovery and the State's evidence with him and misinformed him that the Department of Correction would order the sentences to be served concurrently. A hearing was later held at which trial counsel and the petitioner testified.

The petitioner testified that trial counsel was appointed to represent him and did so throughout the entire process. He stated that trial counsel failed to review the discovery materials with him and said that, in fact, he had only just received the materials prior to the hearing. The petitioner contended that he did not understand what he was facing because of a lack of education. He testified that he had a ninth grade education, but he denied having any problems communicating with people or reading. He acknowledged that he understood all of the conversations with trial counsel, but he said he had not

"completely" understood "some of the words." Nonetheless, he did not ask trial counsel for clarification.

The petitioner acknowledged that trial counsel visited him in the jail approximately ten times, as well as during court appearances. He also acknowledged that he met with the private investigator that trial counsel had hired to investigate the case. The petitioner testified that he communicated more with the investigator than with trial counsel. He re-stated that he never received or reviewed discovery with trial counsel.

The petitioner admitted that he pled guilty to the charges in exchange for two twenty-year sentences that were to be served consecutively. However, he contended that trial counsel, during the recess in the plea hearing, had told him that when he got to the Department of Correction, he would "probably" serve his sentences concurrently. The petitioner did not dispute that, despite trial counsel's alleged statements, he returned to the courtroom and asked if the sentences could be served concurrently rather than consecutively. The petitioner also admitted that the trial court specifically informed him that the sentences were to be consecutive and that he continued entering the plea. According to the petitioner, "I didn't think [the trial judge] was kidding[, but] I just didn't believe it much because I didn't think the charge carried that much [time]." He stated that he believed what trial counsel had told him about the concurrent nature of his sentences.

According to the petitioner, trial counsel presented him with an initial offer from the State for an eighteen-year sentence in exchange for his testimony against the co-defendants. The petitioner testified that he refused the offer because he did not wish to testify. He testified that trial counsel later presented a second offer with a sentence of thirty-five years. He also believed that there had been an additional offer that included a twenty-year sentence. The petitioner did acknowledge that, during the plea hearing, he informed the trial court that he had no issues with trial counsel's performance and that he had not been promised anything in exchange for his guilty plea.

Trial counsel also testified and offered testimony greatly differing from that of the petitioner. According to trial counsel, he began representing the petitioner at the preliminary hearing and continued through the entry of the guilty plea. He testified that he met with the petitioner between eight and fourteen times, as well as during court sessions. He stated that he hired a private investigator for the case. Trial counsel and the investigator often met with the petitioner together, and the investigator additionally met with the petitioner alone. Trial counsel testified that he also fielded several calls from the petitioner's family. He testified that he filed for and received discovery and that he provided a copy to the petitioner. The only discovery items that were not given to the

7

petitioner were discs of interviews and photographs. However, trial counsel reviewed a transcript of the discs with the petitioner during their meetings.

Early in the proceedings, trial counsel asked the petitioner if he wanted to testify against the co-defendants. The petitioner responded that he wanted to speak with his mother prior to deciding. The petitioner eventually chose not to testify. Moreover, trial counsel testified that the State did not need the petitioner's testimony as there was overwhelming evidence of guilt. After a substantial period of time, the State made a plea offer, which trial counsel immediately relayed to the petitioner. The offer was for thirty-five years, with fifteen to be served at 100% and the balance at 30%. According to trial counsel, this was the first offer that was received from the State, and he stated specifically that he was never informed of an eighteen-year offer. When he discussed the thirty-five-year offer with the petitioner, the petitioner wished to speak with his mother. After speaking with his mother, the petitioner chose to reject the offer.

The petitioner's trial was set for June 2012, but the State discovered new evidence, which, according to trial counsel, "changed the landscape substantially." The evidence established that two guns had been fired at the crime scene instead of one and that the petitioner's fingerprints were found inside the burned vehicle. Trial counsel characterized the evidence as "the smoking gun" and described the situation as dire for the defense. Trial counsel testified that he reviewed this information with the petitioner and explained the consequences of the evidence.

The trial was reset for October. On October 23, trial counsel met with the petitioner to discuss a possible plea. After the petitioner had rejected the offer, the State had officially withdrawn the thirty-five year offer. Trial counsel and the petitioner discussed making a counter plea offer to the State. The petitioner agreed, and a proposed agreement was submitted to the State specifying a sentence of thirty-seven years. The State rejected the offer, but it countered with a forty-year agreement, the offer accepted by the petitioner. Trial counsel explained the agreement to the petitioner in detail and, although "it was a difficult academic lesson for [the petitioner]," trial counsel believed that the petitioner understood the consecutive nature of the sentencing.

Trial counsel agreed that he and the petitioner stepped into the hall during a court recess to discuss the plea agreement further after the petitioner questioned the trial court regarding concurrent sentencing. Trial counsel stated that he again informed the petitioner that the two twenty-year sentences were to be served consecutively, although the three-year sentence would be served concurrently. Trial counsel specifically denied that he ever told the petitioner that it was possible that the Department of Correction would allow the sentences to be served concurrently. Trial counsel believed the petitioner understood he was accepting a forty-year sentence. He testified that, upon their

8

return to the hearing, the petitioner again questioned the trial court if the sentences could be concurrent because he just wanted to ask the court.

After hearing the evidence presented and taking the matter under advisement, the post-conviction court filed an order denying relief. The petitioner has timely appealed the court's decision.

**Analysis**

On appeal, the petitioner contends that the post-conviction court erred by denying his petition for relief. Specifically, he contends that trial counsel was ineffective in failing to provide discovery and to ensure that the petitioner, a high school dropout, "knew exactly what he was facing." He further contends that his guilty plea was not entered knowingly and voluntarily because "he was not fully aware of the consequences of his plea" and that he believed, based on trial counsel's advice that, once he got to the Tennessee Department of Correction, his sentences would run concurrently for an effective sentence of twenty years.

In evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). In making this determination, the reviewing court must look to the totality of the circumstances. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App.1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). Indeed,

> a court charged with determining whether . . . pleas were "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993).

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate that guilty pleas be made voluntarily and intelligently. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (citing *Alford*, 400 U.S. at 31).

To succeed in a challenge for ineffective assistance of counsel, the petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the petitioner must establish (1) deficient representation and (2) prejudice resulting from the deficiency. In the context of a guilty plea, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lockhart*, 474 U.S. at 59; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997). The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably-based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceeding. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). However, this deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn.1999). "A trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, conclusions of law are reviewed under a purely de novo standard, with no presumption of correctness. *Id*. at 458.

In its order denying relief, the post-conviction court stated as follows:

> The petitioner asserts that counsel did not discuss the case with him or inform him of the evidence against him, including the fingerprint evidence. The Court accredits the testimony of trial counsel that he provided the petitioner with a copy of discovery and that he informed the petitioner of the fingerprint evidence and its importance. The petitioner has failed to prove this allegation by clear and convincing evidence and has not shown prejudice from the allegation, therefore the petitioner is not entitled to relief on this issue.
>
> The petitioner also alleges counsel failed to explain consecutive sentencing to him. The court accredits the testimony of trial counsel that he thoroughly explained the terms of the plea agreement and told the petitioner the twenty year sentences were consecutive to one another, not concurrent.

10

The Court also notes the transcript of the plea . . . , which shows that the Court explicitly went over the terms of the plea with the petitioner, who said he understood the sentences were consecutive. . . . After detailing how the sentences were to be served, the petitioner asked why they could not be served concurrently. The Court repeated the terms of the plea agreement and counsel offered to speak with the petitioner privately. . . . When the petitioner specifically asked the Court if the sentences could run concurrently, the Court responded, "No," and the petitioner said he understood. . . . The petitioner has failed to prove this allegation by clear and convincing evidence and has not shown prejudice from the allegation, therefore the petitioner is not entitled to relief on this issue.

Further, the Court finds that the petitioner was informed and had sufficient knowledge of the nature and consequences of the plea and that he voluntarily and intelligently chose to enter the guilty plea as evidenced by the transcript of the plea. The Court again accredits the testimony of trial counsel that he explained and went over the plea in detail with the petitioner. In his written motion, the petitioner asserts that he was detoxing in jail and did not fully understand the consequences of his plea at the time it was entered. However, no evidence was presented on this issue. The petitioner has failed to prove this allegation by clear and convincing evidence and has not shown prejudice from the allegation, therefore the petitioner is not entitled to relief on this issue.

In his original pro se motion, the petitioner asserts he is entitled to post-conviction relief because there was only one explanation by the court during his guilty plea that he was receiving consecutive sentencing. The transcript shows the Court explained the sentences would run consecutive three times. . . . The petitioner has failed to prove [the] allegation[] by clear and convincing evidence and has not shown prejudice from the allegation[], therefore the petitioner is not entitled to relief on this issue.

Based upon the foregoing analysis, the Court finds that the petitioner has failed to prove the factual allegations in his petition by clear and convincing evidence. He has not demonstrated by the requisite standard that counsel's performance was deficient or that he would have insisted on going to trial but for counsel's errors. Therefore, the petition is denied.

Following our review of the record, we find nothing which preponderates against the findings made by the post-conviction court. The petitioner's entire argument is supported only by his own testimony, which was contradicted on each point in question

by trial counsel's testimony. The post-conviction court specifically accredited the testimony of trial counsel. As this court has noted on countless occasions, it is not the province of this court to reweigh or re-evaluate determinations of credibility by a post-conviction court. *Henley v. State*, 960 S.W. 2d 572, 579 (Tenn. 1997). It is the lower court that hears the testimony offered by the witnesses and observes first-hand the demeanor and behavior of the witnesses. As noted, we afford the post-conviction court the latitude to make such determinations and conduct our review accordingly.

The record in this case supports the post-conviction court's finding that trial counsel was not ineffective. Trial counsel testified that he provided the petitioner a copy of all the discovery except for a physical copy of certain discs. However, trial counsel prepared a transcript of the material on the discs and reviewed that with the petitioner. He also testified that he did not inform the petitioner that there was a possibility that the sentences would be served concurrently. Trial counsel explained the charges and possible sentencing ranges to the petitioner, as well as conveyed the various plea offers to the petitioner. It belies common sense that the petitioner was not well-informed with regard to his case based upon the number of meetings between himself and trial counsel, as well as with the private investigator. Nothing in the record suggests that trial counsel failed to provide the best defense and advice available based upon the evidence the State had against the petitioner.

Additionally, other than the petitioner's testimony, which the post-conviction discredited, nothing in the record suggests that the petitioner's plea was not entered knowingly and voluntarily. The record suggests that, while the petitioner had a ninth grade education, he was able to read and communicate effectively with counsel. As discussed above, the petitioner was represented by competent counsel, and they had ample opportunities to confer with each other regarding the case. Further, the record establishes that a great deal of advice and explanation was given to the petitioner from both trial counsel and the trial court. The petitioner was facing a potential life sentence for the murder charge, in addition to sentences from the other two charges. By accepting the plea agreement, the petitioner was able to resolve all the charges and received only a total sentence of forty years.

The transcript of the guilty plea hearing weighs heavily against the petitioner's assertions, as nothing in the transcript supports the contentions. The petitioner testified that he was testifying under oath, that he had reviewed the plea agreement with trial counsel, and that trial counsel had answered any questions he had with regard to the agreement. He testified that he understood the rights that he was waiving and that no one had forced or coerced him into accepting the agreement. The answers given by the petitioner to the litany of questions posed by the trial court are not mere "lip service" answers. *Michael J. Hart v. State*, No. W 2006-00783-CCA-R3-PC, 2007 WL 778827,

12

*6 (Tenn. Crim. App, Mar. 15, 2007), *perm. app. denied*, (Tenn. Aug. 13, 2007). They were given under oath and now stand as witness against the petitioner's current assertions.

The petitioner was involved with the plea negotiations and approved the submission of an offer to the State following the withdrawal of the original thirty-five-year agreement. It does not stand to reason that if the State rejected a proposal for an effective thirty-seven-year sentence that it would propose an agreement resulting in an effective twenty-year sentence. Perhaps most harmful to the petitioner's argument is the fact that he returned to the courtroom following the conference with trial counsel and asked the court if the sentences could be served concurrently. To ask such a question supports only the conclusion that the petitioner was aware that the sentences were in fact consecutive. Given the response to the question by the trial court, a failure to understand would not be probable. And with that understanding, the petitioner chose to continue and enter the guilty plea. He is not entitled to post-conviction relief.

## CONCLUSION

Based upon our review of the record, the judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

13